# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

**FELMAN PRODUCTION, INC.,**

**BONHAM BUSINESS CORP,**

**WARREN STEEL HOLDINGS, LLC,**

**STEEL ROLLING HOLDINGS INC.,**

**PLAMA LIMITED,**

and

**STALMAG sp. z o.o.,**

                **Plaintiffs,**

v.                                  **CIVIL ACTION NO. 3:06-0644**
                                            **(Judge Chambers)**

**BORIS BANNAI,**

**DAVID BINIASHVILI,**

**AMERICAN STEEL & ALLOYS, LLC,**

and

**MOSKOTREE INVESTMENTS LIMITED,**

                **Defendants.**

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIONS

Plaintiffs Felman Production, Inc., Bonham Business Corp., Warren Steel Holdings, LLC, Steel Rolling Holdings Inc., Plama Limited and Stalmag sp. z o.o. (collectively, the "Plaintiffs"), by and through their undersigned counsel, submit the following arguments and authorities in support of Plaintiffs' Motion for Preliminary Injunctions filed herewith. Plaintiffs respectfully request that this Court grant Plaintiffs' Motion based on the reasons set forth below:

**I.     PRELIMINARY STATEMENT**

Plaintiffs Warren and Plama request that the Court enjoin Defendants Boris Bannai ("Bannai") and American Steel & Alloys, LLC ("ASA") from taking possession of and/or interfering with the operation of a water treatment facility (the "Water Treatment Facility") that provides services to a steel plant in Warren, Ohio (the "Warren Plant"). The Warren Plant uses and is dependent on the electrical and waste water treatment services provided by the Water Treatment Facility. Plaintiffs allege that Bannai and ASA have usurped Plaintiffs' corporate opportunity to purchase the Water Treatment Facility, and, until that issue is resolved, Plaintiffs' seek this Court's assistance in preserving the status quo.

All Plaintiffs request that the Court enjoin Defendants from receiving funds expected to be dispersed to Bannai in a related bankruptcy proceeding currently pending in Case No. 05-30516 (the "Bankruptcy Proceeding") before the United States Bankruptcy Court for the Southern District of West Virginia (the "Bankruptcy Court"). If Bannai is allowed to receive these funds, there is a substantial likelihood that the funds will be dissipated to sources outside the jurisdiction of this Court leaving minimal, if any, assets in the United States against which Plaintiffs can recover to reimburse Plaintiffs for funds taken from Plaintiffs by Defendants.

Accompanying this memorandum of law, Plaintiffs also submit in support of their motion the declarations of Viktor Skiba (the "Skiba Declaration"), Vyacheslav Anishchenko (the "Anishchenko Declaration) and Tom Butryn (the "Butryn Declaration"), which are attached hereto as Exhibits "A" through "C" respectively.

Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331 and 1337(a) and 18 U.S.C. § 1964(c) because this case arises under the laws of the United States based on claims under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

## II. FACTUAL BACKGROUND

In this action Plaintiffs seek to recover damages incurred as a result of a multi-year racketeering scheme perpetrated by Borris Bannai ("Bannai") and the other Defendants. Bannai began the fraudulent scheme in May 2003 when he attempted to induce Igor Kolomoisky ("Kolomoisky") to purchase his interests in a ferro-alloy plant in Poland and a ferro-alloy plant in West Virginia as part of a joint venture. Although no joint venture was ever formed between Bannai and Kolomoisky, numerous entities of which Kolomoisky is the principal owner or co-owner, the Plaintiffs herein, were victims of the fraudulent and illegal scheme of Bannai and the other Defendants. Compl. ¶¶ 1-80.

### THE POLISH FRAUD

Initially, Bannai agreed to sell the Polish steel plant to Plaintiff Stalmag sp. z o.o. ("Stalmag"), subject to Stalmag's agreement to purchase ore (the "Polish Ore Agreement") from Defendant Moskotree Investments Limited ("Moskotree"). As a director of Moskotree, Bannai entered into the Polish Ore Agreement with Stalmag, agreeing to ship ore from mines in Namibia and South Africa to Stalmag after receipt of a $4.35 Million advance payment to Moskotree. Moskotree, which was managed by Defendant David Binizshvili, a relative of Bannai, did not, however, supply any ore and failed to return the $4.35 Million payment. In fact, Bannai was not authorized to act on behalf of Moskotree and never intended to honor the Polish Ore Agreement. Moreover, Bannai, in an attempt to avoid any obligation to return the prepayment, entered into a

3

self-dealing transaction purportedly transferring Moskotree's liability to a company associated with Plaintiffs.

## THE WEST VIRGINIA FRAUD

Bannai similarly made false representations regarding the supply of manganese ore to a plant located in New Haven, West Virginia (the "New Haven Plant") previously owned by Highlanders Alloys LLC ("Highlanders"), a Bannai entity that is currently the debtor in the Bankruptcy Proceeding. Based on the promise that Bannai would supply manganese ore to the New Haven Plant, Plaintiffs entered in to the Ore purchase agreement ("Ore agreement"). The Ore agreement was conditional to the purchase of the assets of Highlanders by Felman Production, Inc. ("Felman") for $20 Million in 2006 through a section 363 sale in the Bankruptcy Proceeding, despite the fact that the West Virginia Plant was non-operational, insolvent and the subject of numerous environmental violations for which an arrest warrant had been issued against Bannai. Bannai, through another of his businesses, entered into a contract with Felman's related company, Bonham Business Corp. ("Bonham"), a Plaintiff herein, to supply the ore to the New Haven Plant (the "West Virginia Ore Agreement"). Pursuant to the West Virginia Ore Agreement, Bonham advanced $1 Million to Northgate Distribution Services Limited ("Northgate"), a Bannai company, in November 2005, but the ore was never supplied and the payment was never returned. In fact, Bannai never intended to honor the West Virginia Ore Agreement and, instead, used it to fraudulently obtain monies from Bonham. Felman suffered loss because it was required to purchase ore in the open market, which delayed the reopening of the New Haven Plant.

**THE OHIO FRAUD**

In late 2005 Kolomoisky agreed to permit Bannai to manage the startup of a steel plant in Warren, Ohio (the "Warren Plant") owned by Plaintiffs Warren Steel Holdings, LLC ("Warren") and Plama Limited ("Plama"). Unbeknownst to Kolomoisky and the other owners of Warren, Bannai and ASA falsely represented to suppliers, potential customers and the trade media that Bannai owned fifty percent (50%) of the Warren Plant in order to obtain credit terms, creating $2 million of debt for which Warren or Plama may become liable. In addition, Bannai and ASA usurped Warren's opportunities by secretly entering into contracts and other transactions in the name of ASA, although such contracts should have been entered into in Warren's name. Specifically, in May 2006, ASA contracted to purchase the Water Treatment Facility located adjacent to the Warren Plant from Veolia Water North America-Central LLC for $675,000. Bannai and ASA fraudulently misrepresented that ASA owned the Warren Plant. The Water Treatment Facility is vital to the operations of the Warren Plant, as specifically detailed in the Butryn Affidavit. The Water Treatment Facility does not have any other purpose except to service the Warren Plant. Defendants intentionally purchased the Water Treatment Facility in order to gain control over the operations of the Warren Plant. Plaintiffs Warren and Plama seek injunctive relief to permit Warren to utilize the Water Treatment Facility. In order to restart the Warren Plant, Warren must invest at least $4 to 6 million over the next 120 days for various projects. Warren will not do so unless it has assurance that it will be permitted to operate the Water Treatment Facility. Once operational, Warren may employ at least 100 employees.

**THE DETROIT FRAUD**

In 2006 Plaintiff Steel Rolling Holdings Inc., a Kolomoisky Delaware corporation, purchased the assets of a non-operating steel company through a receivership auction in Detroit. As part of the effort to aggrandize his role in the United States steel industry, Bannai falsely represented that he had an interest in this venture as well. Ultimately, when Kolomoisky uncovered Bannai's false representations about the ownership of the Warren Plant and the Detroit facility in mid-2006, as well as his failure to restart the Warren Plant, Bannai's over-all fraudulent scheme to take illegitimate control of the Plaintiffs' property became clear.

**PLAINTIFFS' DAMAGES**

Based on the Defendants' fraudulent activity, the Plaintiffs have collectively suffered losses in an amount of at least $10 million, which is trebled to $30 million under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), plus costs and attorneys' fees. In the Complaint filed herein, Plaintiffs seek to recover their losses from the Defendants under multiple theories of liability, including claims under RICO, fraud claims and claims for unjust enrichment, breach of contract, breach of fiduciary duty and intentional interference with contract. Additionally, Plaintiffs are seeking a prejudgment Order of Attachment pursuant to West Virginia Code Sections 38-7-1, *et seq.* because Defendants are nonresidents of West Virginia.[1]

---

[1] W. Va. Code § 38-7-1 provides, in pertinent part:

> In any civil action for the recovery of any claim or debt arising out of contract, or to recover damages for any wrong, the plaintiff, after service of the summons upon the defendant, or at any time thereafter and before judgment may have an order of attachment against the property of the defendant….

W. Va. Code § 38-7-2 provides, in pertinent part:

**BANNAI'S EQUITY IN HIGHLANDER**

Plaintiffs are likely to prevail on their claims, and in the event that they do, recovery will be sought against Defendants' assets in the United States. These assets include approximately $6 million held by the Highlander bankruptcy estate (the "Funds"). Bannai is currently seeking an order from the Bankruptcy Court authorizing the distribution of the Funds to himself and purported "Bannai Creditors." If the Bankruptcy Court orders the distribution of the Funds, Bannai will receive a proposed distribution of $3,144,262.93, and the "Bannai Creditors" are to receive a proposed distribution of $3,012,000.00. If the Bankruptcy Court approves the Distribution Motion,[2] Bannai and the "Bannai Creditors" will receive the proposed distributions, and the Assets will almost certainly be exported and dispersed to Defendants' interests outside of the United States. Plaintiffs request that this Court enter a preliminary injunction, enjoining Defendants from receiving the Funds, thereby preserving the status quo and keeping the Funds in the United States available for attachment and execution until this matter is fully resolved on its merits.

**III. ARGUMENT**

In this Circuit, the standard governing consideration of a Rule 65 motion for injunctive relief is a "balance-of-hardship" test. *See Merrill Lynch v. Bradley*, 756 F.2d 1048, 1054-55 (4th Cir. 1985) (applying balance of hardship test in affirming issuance of injunctive relief); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802 (4th Cir. 1991) ("the 'first

---

> The grounds upon which an order of attachment may issue, under the preceding section [§ 38-7-1], are the following: (a) That the defendant, or one of the defendants, is a foreign corporation or is a nonresident of this State….

[2] On July 28, 2006, Plaintiffs filed an "Objection to Motion to Authorize Distribution to Creditors" with the Bankruptcy Court. A hearing on the Motion and Objection will be heard Sept. 18, 2006 by the Bankruptcy Court.

step' to be taken by the court in connection with a request for interim relief is to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant"); *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193-96 (4th Cir. 1977) (applying fourfold balance of hardship test). "The balance-of-hardship test correctly emphasizes that, where serious issues are before the court, it is a sound idea to maintain the *status quo ante litem motam*, provided that it can be done without imposing too excessive an interim burden upon the defendant." *Blackwelder*, 550 F.2d at 195.

Under the balance of hardship test the court must consider, in "flexible interplay," the following four factors in determining whether to issue a preliminary injunction: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. *Blackwelder*, 550 F.2d at 189; *Merrill Lynch*, 756 F.2d at 1054.

The purpose of a preliminary injunction is "to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 525 (4th Cir. 2003); *see also, Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("The purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the illegality alleged in the complaint"); *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir. 1991) ("The rationale behind a grant of a preliminary injunction has been explained as preserving the *status quo* so that a court can render a meaningful decision after a trial on the merits") (quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991)).

In the instant case, the balance of hardships weighs heavily in favor of granting a preliminary injunction. Plaintiffs' request for relief will merely maintain the status quo until a final determination can be made in this matter. First, the Warren Plant will not be able to reopen unless access to the Water Treatment Plant is assured. Second, if this request is not granted, Defendants will receive and disperse the Funds through Defendants' international business interests, leaving no assets in the United States against which the Plaintiffs can recover. Therefore, injunctive relief is necessary and appropriate.

### A. Water Treatment Facility

#### 1. Plaintiffs Warren and Plama Will Suffer Irreparable Harm If The Water Treatment Facility Stops Operating

Plaintiffs Warren and Plama will suffer irreparable harm if the Water Treatment Facility is not kept operational during the pendency of this litigation. Currently, as detailed by the Butrun Declaration, the Water Treatment Facility is providing electricity and water treatment to the Warren Plant. However, the Defendants have the ability at any time to alter the operation of the Water Treatment Facility, or halt its operation entirely, leaving the Warren Plant without any alternative supply source and crippling the Warren Plant. Currently, Defendants Bannai and ASA, due to their usurpation of Warren's corporate opportunity, own and control the Water Treatment Facility adjacent to the Warren Plant. Any change in the Water Treatment Facility's operations will have an immediate and adverse impact on the Warren Plant. There are no other immediate sources of electricity and water treatment that could maintain the necessary supply to the Warren Plant. Because the Warren Plant is completely dependant upon the Water Treatment Facility for functionality, it is imperative that while this litigation continues the Water Treatment Facility remains functional and operational. Plaintiffs Warren and Plama will compensate

Defendants for the cost of maintaining the Water Treatment Facility pending the outcome of this litigation.

### 2. Defendants Would Suffer Little or No Harm if the Water Treatment Facility is Allowed to Continue Supplying Power to the Warren Plant

Defendants will not be harmed by granting the injunction because granting Plaintiffs Warren and Plama's request for relief will merely maintain the status quo until a final determination can be made in this matter. The Water Treatment Facility will continue to service the Warren Plant while the allegation of corporate usurpation is litigated. Conversely, if the Plaintiffs' request is not granted, the Defendants will be able to alter the function or shut down the Water Treatment Facility at their will. This, in turn, will completely prevent the Warren Plant from functioning in any capacity.

### 3. Plaintiffs Warren and Plama are Likely to Succeed on the Merits

Where the probable injury to the plaintiff without an injunction is far greater than the injury to the defendant with an injunction, "it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." *Blackwell*, 550 F.2d at 196; *see also, Direx Israel*, 952 F.2d at 808. As established above, the injury Plaintiffs Warren and Plama will suffer without an injunction is far greater than any hardship on the Defendants with an injunction. Nevertheless, there is a strong likelihood that the Plaintiffs will succeed on the merits.

Put simply, Plaintiffs Warren and Plama are almost certainly likely to succeed on their claims that Bannai and ASA usurped a corporate opportunity by purchasing the Water Treatment Plant. Bannai and ASA owed fiduciary duties to Warren and Plama not to seize their opportunities, but did exactly this. Because Plaintiffs Warren and Plama are likely to succeed on

the merits and would suffer irreparable harm if the Defendants alter or shut down the Water Treatment Facility, Plaintiffs Warren and Plama respectfully request that this Court grant the requested injunction.

### 4. Public Policy Weighs in Favor of Granting an Injunction

Finally, the public interest favors preserving the status quo until the merits of this serious controversy can be fully considered by the Court. In particular, the public interest favors the protection of persons whose opportunities are usurped in violation of fiduciary duties. Further, the public interest will be served if the Warren Plant is permitted to open and over 100 employees may be employed. Accordingly, if the Defendants are allowed to use the Water Treatment Facility, which ASA obtained by usurping Warren's corporate opportunity and unlawful racketeering methods, to cripple the operations of the Warren Steel Facility the public policy will be severely undermined.

## B. Injunction to Prevent Payout of Funds

### 1. All Plaintiffs will Suffer Irreparable Harm if Defendants are not Prevented from Dissipating Assets

All Plaintiffs will also suffer irreparable harm if Defendants are not enjoined from receiving and exporting the Funds. Courts in this Circuit have held that irreparable harm will occur to a party if funds are dissipated. *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 499 (4th Cir. 1999) *citing Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (court had authority to issue preliminary injunction to "prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies" where plaintiffs brought, among others, RICO claims). Currently, the Funds are held by the Highlanders bankruptcy estate under the supervision of the Bankruptcy Court. However, once the Funds are

11

disbursed to Bannai, he will almost certainly remove the Funds from the jurisdiction, leaving minimal, if any, assets in the United States against which Plaintiffs can recover.

Due to the fact that the Defendants Bannai and Biniashvili are citizens of Israel and nonresidents of this State and the Defendants ASA and Moskotree are foreign companies organized under the laws of Delaware and Cyprus, respectively, Plaintiffs are entitled to a pre-judgment order of attachment to Defendants' assets pursuant to West Virginia Code Sections 38-7-1, *et seq*. W. Va. Code § 38-7-2(a). If Defendants' receive the Funds and remove them from the jurisdiction, there will be no assets which may be attached. Therefore, in this case, such preliminary injunctive relief is necessary to preserve Plaintiffs' equitable remedy against Defendants and without it, that equitable right will be irretrievably lost to Plaintiffs.

### 2. Defendants Will Suffer Little or No Harm With an Injunction

Defendants will not be harmed by granting the injunction because granting Plaintiffs' request for relief will merely maintain the status quo until a final determination can be made in this matter. The Funds at issue will continue to be held by the Highlander bankruptcy estate or may be placed in escrow until the resolution of this matter. Conversely, if the Plaintiffs' request is not granted, Defendants will be permitted to receive, export or otherwise disperse the Funds, thereby permanently taking away Plaintiffs' rights to equitable relief.

### 3. Plaintiffs are Likely to Succeed on the Merits

First, Plaintiffs are entitled to relief because they are likely to succeed on each of sixteen (16) separate claims, the grounds for which are established in the Complaint filed in this civil action. Specifically, Plaintiffs are entitled to recover $5.35 million under their breach of contract claims, alone. Pursuant to the Polish Ore Agreement, Plaintiff Stalmag advanced $4.35

million to Defendant Moskotree for ore that was never shipped. Under the West Virginia Ore Agreement, Plaintiff Bonham advanced $1 Million to Northgate, the Bannai entity, for ore that was never shipped. The advances under the two contracts were never returned by Defendants. Accordingly, Plaintiffs are entitled to recover $5.35 from the Defendants for breach of the Polish Ore Agreement and the West Virginia Ore Agreement.

Plaintiffs will also prove that Bannai and the other Defendants made fraudulent representations in connection with the Polish Plant, the New Haven Plant, the Michigan Plant and the Warren Plant, upon which the Plaintiffs relied to their detriment. Moreover, Bannai and the other Defendants made false representations to third-parties, breaching their fiduciary duty, intentionally interfering with Plaintiffs' prospective contracts and usurping Plaintiffs' corporate opportunities.

In addition to each of these claims, Plaintiffs are likely to succeed on their civil RICO counts against the Defendants, because the Defendants furthered their illegal and fraudulent scheme by use of the mail, telephone and electronic communication, all in violation of RICO; *see*, *Eplus Tech., Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002).

Second, Plaintiffs' request for injunctive relief should be granted because Plaintiffs are entitled to a pre-judgment order of attachment pursuant to West Virginia Code Sections 38-7-1, *et seq.* As established in the Complaint, this civil action is "for the recovery of any claim or debt arising out of contract, or to recover damages for any wrong." W. Va. Code § 38-7-1. Additionally, an order of attachment may issue on several grounds, including the fact "that the defendant, or one of the defendants, is a foreign corporation or is a nonresident of this State" and "is removing or is about to remove, his property, or the proceeds of the sale of this

property, or a material part of such property or proceeds, out of this State, so that process of execution on a judgment decree in such action or suit, when it is obtained, will be unavailing." W. Va. Code § 38-7-2.  Accordingly, Plaintiffs are entitled to an order of attachment pursuant to West Virginia law.

### 4.  Public Interest Favors the Injunctive Relief Sought

The public interest is further enhanced where, as here, the private controversy may possibly vindicate public policy.  The public policy behind civil RICO statutes is to eradicate organized crime in the United States and to prevent it from infiltrating legitimate businesses.  116 Cong. Rec. 591 (1970); S. Rep. No. 91-617, p. 76 (1969).  Here, the public interest is furthered by enjoining Defendants from receiving and dispersing the Funds.

As the Supreme Court has said, the "object of civil RICO is . . . not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity . . . .  The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better."  *Rotella v. Wood*, 528 U.S. 549, 557 (2000).  The Senate Committee Report on RICO, comparing the RICO Act to the antitrust laws, similarly explained that RICO "attacks a far more heinous threat" so that "an attack must be made on the source of economic power itself, and the attack must take place on all available fronts."  S.Rep. No.617, 91st Cong., 1st Sess. 79 (1969).

## IV.  <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs respectfully request that their Motion for Injunctive Relief be granted, and that this Court issue the proposed injunction to (A) prevent any of the Defendants from tampering with or shutting down the Water Treatment Facility and (B)

receiving or taking any other action with respect to the Funds prior to the resolution of this civil action.

DATED:  September 11, 2006

Respectfully submitted,

FELMAN PRODUCTION, INC.
BONHAM BUSINESS CORP,
WARREN STEEL HOLDINGS, LLC,
STEEL ROLLING HOLDINGS INC.,
PLAMA LIMITED,
STALMAG sp. z o.o.,

By Counsel

/s/ Edward D. McDevitt
Edward D. McDevitt (WVSB #2437)
Courtney A. Kirtley (WVSB #9414)

Of Counsel
Bowles Rice McDavid Graff & Love LLP
600 Quarrier Street
Post Office Box 1386
Charleston, West Virginia  25325-1386
(304) 347-1711
(304) 343-3058 (facsimile)

and

Bruce S. Marks (PA Bar #41299)
Gene M. Burd (PA Bar #80120)
Thomas Sullivan (PA Bar #63541)

Marks & Sokolov, LLC
1835 Market Street 6th Floor
Philadelphia, Pennsylvania  19103
(215) 569-8901
(215) 569-8912 (facsimile)

1621665